# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01904-COA

JEREMY WILLIAM RADAU A/K/A JEREMY
RADAU A/K/A JEREMY W. RADAU                                      APPELLANT

v.

STATE OF MISSISSIPPI                                                APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/04/2013 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 12/16/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., ROBERTS AND MAXWELL, JJ.

### MAXWELL, J., FOR THE COURT:

¶1. Jeremy Radau was convicted of capital murder after beating a seventy-four-year-old man to death with a baseball bat. While Radau admits killing the elderly man, he disputes he intended to commit a robbery—the underlying felony that elevated the crime to capital murder. But Radau's girlfriend testified robbery was the motive. And authorities recovered the stolen cash and the baseball bat Radau lifted from the victim's apartment after killing him

with it. After review, we find sufficient evidence supports the capital-murder conviction, and the verdict was not against the weight of the evidence. We affirm.

**Facts and Procedural History**

¶2.      Around 7:30 a.m. on September 19, 2009, Radau and his girlfriend, Megan Kinberger, went to Charles Pickell's apartment in Biloxi. The couple had been on a binge all night—with Radau drinking heavily and Kinberger drinking and taking Xanax. According to Kinberger, they intended to rob Pickell.[1]  And Megan had also hoped to get some Xanax pills from him.

¶3.      Pickell's neighbor, Bernard Brown, heard the couple pounding on Pickell's door. When Pickell answered the door, Radau told Pickell he was friends with his daughter and was there to see if he needed food or money. Pickell let Radau and Kinberger in the apartment. Brown was suspicious of the couple, so he called Pickell and asked him if he knew them. Pickell said he did and that he was fine. But Brown thought the encounter was unusual. So when the couple momentarily left to go to their car before returning to Pickell's apartment, Brown videoed the two. Brown then left for choir practice.

¶4.      Once inside the apartment, Radau claimed the three began negotiating a price for Kinberger's cleaning services. Apparently, Kinberger had previously cleaned Pickell's apartment and bought pills from Pickell. Radau testified that he asked Pickell how much money he had, and Pickell gave him $140 in cash. Radau claimed he told Pickell for an extra

---

[1] Radau testified that they did not intend to rob him but only went there to get some Xanax pills.

2

$100, Pickell could have sex with Kinberger. Pickell supposedly said he did not have any more money, but he offered to swap Xanax for sex with the girl. Radau claimed Kinberger was okay with this arrangement, but he was not.

¶5. The three then began to argue, and Kinberger testified that at some point she left the living room and began rummaging through Pickell's bedroom drawers, looking for something to steal. After she used the bathroom, Kinberger returned to the living room, where she discovered Radau beating Pickell "pretty hard" with a baseball bat. Kinberger saw Radau with money in his hand and noticed one of Pickell's pants pockets was inside out.

¶6. Radau's story was a bit different. He claimed Pickell tried to hit him with the baseball bat, which Radau wrestled from him. Radau then purportedly hit Pickell with the bat, knocking him into his recliner. Radau testified that "[w]hen [Pickell] tried to get back up, I hit him again[.] . . . And he tried to get back up again after the third time, so I just hit him again, but this time I just blacked out from there." As Radau put it, "I just kept hitting him until he stopped moving so he wouldn't get back up." Radau claimed Pickell had already given him cash but it was not enough. According to Radau, the situation had "to do with money, pills, [and] prostitution"—not a robbery.

¶7. Kinberger suggested they call for help since Pickell was still alive and making noises. But Radau said they should flee. Radau took Pickell's baseball bat because he knew it would be evidence.[2] Kinberger testified that Radau counted the stolen cash[3] in the parking lot. The

---

[2] Radau testified that when leaving the apartment he hid the baseball bat in his pants. Authorities retrieved the baseball bat from Radau's car the next morning. Blood on the bat

couple then drove to the beach, rented a room at the Motel Six in Gulfport, then snacked on Krispy Kreme donuts.

¶8.	Later that day, Brown returned from choir practice. Pickell's sister had been unable to reach Pickell by phone, so she called Brown to check on him. Brown noticed the apartment door was cracked open, which was unusual. After knocking and not getting an answer, he walked in and found Pickell beaten and covered in blood in his recliner.[4] Pickell was not breathing, and Brown called 911.

¶9.	The next morning, Radau and Kinberger went to Kinberger's mother's house, where they were arrested.

¶10.	On September 13, 2010, Radau was indicted for capital murder, with robbery as the underlying felony. A jury found him guilty, and the judge sentenced him to life imprisonment. Radau appealed.

**Discussion**

**I.	Sufficiency of the Evidence**

¶11.	While Radau admits he killed Pickell, he argues the evidence was insufficient to show the killing occurred during a robbery. We disagree.

---

matched Pickell's DNA. Blood on Radau's underwear also matched Pickell's DNA.

[3] Kinberger testified Radau had a hundred and some twenties. $342 in cash was recovered from Radau, which was admitted into evidence.

[4] Several photographs of the scene were admitted into evidence. One showed Pickell's bloody body in the recliner. There was blood spatter on the walls, blinds, and ceiling. The cause of death was determined to be massive head injury from multiple blows to the head, laceration of the scalp, and brain damage.

4

¶12. In considering the legal sufficiency of evidence, we consider all evidence in the light most favorable to the State. *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005). And "[c]redible evidence consistent with guilt must be accepted as true." *Davis v. State*, 130 So. 3d 1141, 1150 (¶37) (Miss. Ct. App. 2013). "We are instructed to give the State the benefit of all favorable inferences reasonably drawn from the evidence." *Id*. (citing *Jones v. State*, 20 So. 3d 57, 64 (¶16) (Miss. Ct. App. 2009)). Weight and credibility are matters for the jury to resolve. *Id*. "Reversal is proper when reasonable and fair-minded jurors could only find the accused not guilty." *Id*. Our task is to decide if a reasonable juror could not possibly find the defendant guilty based on the evidence presented. *Id*.

¶13. Our review shows Radau's jury was properly instructed on capital murder during a robbery.[5] Capital murder is the "killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery[.]" Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014).

---

[5] Jury Instruction S-2A states:

If you find from the evidence . . . beyond a reasonable doubt that: . . . [Radau] did . . . willfully, unlawfully, feloniously and with or without deliberate design, . . . kill and murder [Pickell], a human being, without authority of law, . . . while in the commission of the crime and felony of [r]obbery as defined by [s]ection 97-3-73, . . . in that [Radau] did . . . willfully, unlawfully and feloniously, with intent to permanently deprive the owner thereof, take, steal, and carry away the personal property of [Pickell], from the presence and against the will of the said [Pickell] by violence to his person, then you shall find [Radau] guilty of capital murder.

5

¶14. To establish robbery, the State had to prove beyond a reasonable doubt that Radau: "(1) feloniously took (2) the personal property of another (3) in his presence or from his person and (4) against his will, (5) by violence to his person or putting such person in fear of some immediate injury to his person." *Batiste v. State*, 121 So. 3d 808, 842 (¶63) (Miss. 2013). "The element of felonious intent may be shown by the facts surrounding the crime." *Id*. at (¶64). When a person is found with a "dead victim's personal property, the jury reasonably may infer that the defendant had the requisite intent to rob." *Id*.

¶15. Here, Kinberger testified that she and Radau went to Pickell's house to rob him. They backed their car into a parking space before approaching the apartment. And once inside, Kinberger looked for something to steal. When she reappeared in the living room, she saw Radau with cash in hand, as he beat Pickell to death with a bat. She also noticed Pickell's pants pocket was inside-out. Kinberger recalled Radau counting the stolen cash. And law enforcement recovered cash from Radau the next morning. They also found the stolen blood-stained bat. Considering this evidence in the light most favorable to the State, the underlying robbery was clearly proven.

## II. Weight of the Evidence

¶16. Radau also insists the verdict was against the overwhelming weight of the evidence. His weight-based challenge is identical to his attack on the sufficiency of the evidence. When a weight-of-the-evidence argument is made, we weigh the evidence "in the light most favorable to the verdict." *Bush*, 895 So. 2d at 844 (¶18) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). We will disturb a verdict only in those rare cases where "it is so

6

contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* For the same reasons we found the State sufficiently proved robbery, we likewise find the robbery-based capital-murder guilty verdict was by no means against the weight of the evidence. We affirm.

¶17. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.**